# STATE OF FLORIDA v LARA
## Case No. 82-23983-C
Eleventh Judicial Circuit, Dade County

May 1, 1987

**APPEARANCES OF COUNSEL**

**Leonard Glick,** Assistant State Attorney, for plaintiff.
**Jerrell Breslin** for defendant.

### OPINION OF THE COURT

PHILIP BLOOM, Circuit Judge.

This matter came before the Court on a Motion (and amendments thereto) for post-conviction relief pursuant to Rule 3.850, Fla.R.Crim.P., made in behalf of defendant Ramon Lara, alleging ineffective assistance of counsel. The Motion specifically sets out the areas of alleged ineffective assistance of counsel. See *Knight v. State*, 394 So.2d 97 (Fla. 1981).

This Court granted a hearing wherein the trial attorney for defendant Lara (Richard Houlihan of the Public Defender's Office) and Mr. Lara testified extensively with respect to the facts and issues involved here. Additionally, the Court reviewed several times the transcript of the trial proceedings without a jury that took place before the Honorable Richard Y. Feder. That transcript, consisting of fifty-seven (57) pages, was attached to the instant Motion, together with other documents, and a more recent motion in behalf of Lara to admit polygraph examinations of defendant Lara and co-defendant Carlos Rodriguez. The initial Motion in behalf of Mr. Lara was made over one year ago, was supplemented thereafter, and due to various intervening circumstances and requests by the parties, was not heard by this Court until many months thereafter, by agreement of the parties.

This case concerns one of our most important Constitutional rights: the right of a defendant in a felony case to be represented by an attorney. The defendant contends that he was deprived of effective assistance of counsel at the trial stage of these proceedings and, therefore, also was deprived of his rights to trial by jury, to testify, and to confront the witnesses against him.

By Information, Lara and two other defendants were charged with three crimes: (1) Murder, second degree; (2) Attempted armed robbery; and (3) Grand theft of an automobile.

### Lara's Conviction and Appeal

The case was submitted to the trial judge (Feder) on a "Stipulated Statement of Facts," a Sworn Motion to Dismiss, and a Traverse (hereinafter collectively referred to as "Stipulation"). Lara was convicted, and appealed to the District Court of Appeal, Third District, on the ground that his waiver of his right to jury trial was improper. That Court affirmed the conviction in *Lara v. State*, 475 So.2d 1340 (1985).

### Lara's Present Contentions

According to Lara's present counsel, the waiver of jury trial, and the facts agreed to in the Stipulation, when combined with the "attitude" of Lara's trial counsel in attempting to predict the judge's decision of

acquittal, created a "mind set" on the part of Lara's counsel which rendered ineffective any legal assistance to Lara. The evidence taken at the Rule 3 hearing before this Court confirms the reason that a decision was made by defendant Lara and his attorney to avoid either a jury trial or any other live testimony before any trier of fact, as shall hereinafter appear.

Succinctly stated, the evidence before this Court was that defendant Lara coincidentally met two other co-defendants at a gasoline station and then travelled with them in an automobile to a cafeteria. Lara remained with the car, while the two others went inside and approached the owner of the cafeteria demanding money from the cash register. When the two defendants were inside the cafeteria, the owner drew a gun and as the two co-defendants fled, the cafeteria owner started shooting. A 17-year-old girl was killed by a bullet shot from that gun. The more detailed "facts" are interspersed throughout this Order. The principal issue as to Lara in the trial proceedings was whether the two co-defendants drove to and approached the owner of the cafeteria to commit robbery and whether defendant Lara knew that prior to the killing.

This defendant's case was fully explored by pre-trial discovery. After extensive hearings and oral argument, Judge Feder found the defendant guilty beyond a reasonable doubt on two of the counts: murder second degree and attempted armed robbery.

In order to reach a proper decision here, it is essential to review the proceedings before Judge Feder and to review the alleged errors of Lara's trial counsel to determine whether the legal assistance provided Lara at trial was ineffective in the totality of the circumstances of the entire case.

It should be noted that American jurisprudence is based on the *objective* theory of conduct rather than the *subjective* theory of the mind. This means that thoughts and mental processes are reflected by words or communicated acts or conduct, i.e., by overt expressions of meaning and intent, rather than by speculative or uncommunicated thoughts, i.e., by silence as to any expressions of meaning and intent.

Our inquiry should be directed to the following:

1. Did defendant Lara's counsel protect Lara's rights, or was Lara's attorney ineffective in his assistance to him; and

2. Did defendant Lara intelligently understand and agree to the proceedings before Judge Feder?

60

*The Proceedings before Judge Feder*

On December 19, 1984, the agreed to non-jury trial of this case came before Judge Feder. The transcript of the proceedings shows that both Mr. Lara and the court interpreter were duly sworn and the following took place:

"THE COURT: Mr. Lara, as I understand it, you have discussed with your lawyer trying this case in front of the Court without a jury; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: You understand you have an absolute right to trial by jury?

THE DEFENDANT: Yes.

THE COURT: But, you are willing to waive that right and go to trial in front of me; is that correct?

THE DEFENDANT: Yes, sir." (at p 3)

. . . . . . . . . . .

THE COURT: Okay. Anything you wish to inquire of him in this regard?

MR. GLICK: Judge, I would only ask the Court to advise the defendant that as a result of the stipulation between counsel for the defense and the State, that live witness will not be appearing, but that we have agreed to several statements of fact that would be the testimony of the witnesses, were they to appear.

MR. HOULIHAN: If I can say one thing quickly just for the Court's knowledge. I was told—I do not speak Spanish—that it's easier to use the word agreement instead of stipulation. So, in talking with Mr. Lara, I said we had agreed.

THE COURT: You also understand, Mr. Lara, that there will be no live witnesses testifying?

THE DEFENDANT: Yes, sir.

THE COURT: The Court is going to decide this case based upon an agreement between the State and your attorney as to what the facts are. Do you understand?

THE DEFENDANT: Yes.

THE COURT: I will base my decision on that agreement of what the true facts are, as if the witnesses had come to court and testified just as it is in the agreement between your attorney and the State Attorney. Is that okay?

**61**

THE DEFENDANT: Yes, sir." (at pp 4-5)

During these proceedings, Judge Feder conducted an extensive inquiry into the facts of the alleged crimes and the applicable law. Judge Feder concluded as follows:

THE COURT: Circumstantial evidence is, and can be, more convincing than direct evidence on occasion, certainly more than identity evidence. At least it has been my experience to that effect.

I have got to be satisfied beyond a reasonable doubt of each of the elements and circumstances the State is offering, and that they lead to the conclusion of guilt, and there is no hypothesis of innocence that I can look at to explain the circumstances enough.

MR. HOULIHAN: Yes, sir.

THE COURT: I think the State is correct that each of the circumstances listed, namely the parking on 3rd Street, around the corner from the store of Mr. Perez, the being the driver of the vehicle, sitting in the car, looking to the right and left nervously, the discovery of a weapon under the driver's seat of this vehicle, which would be directly under where the defendant sat, with his fingerprint on a bullet inside the gun, which indicates, obviously he at some time had possession and control of that weapon, driving away from the scene, first in an easterly direction and then being blocked by the Wells Fargo truck, seeing Batista and Rodriguez come back to the car with their guns in their hand, open and obvious, making a sudden U-Turn and escaping in a westerly direction, and then running into a pole and leaving the car and some other things, fleeing the scene and giving a story that was untrue when captured, in and of themselves don't establish anything, but I am satisfied, as the trier of fact, that adding them altogether, they establish beyond a reasonable doubt that he knew this armed robbery was going to occur, intended to participate and was helping to assist them, by driving them to the scene and then helping them escape or attempt to escape from the scene.

I don't arrive at that easily, I assure you, and I prefer being a Judge of the law than the facts, but I think adding all those things together, in light of the decisions of the appellate courts, I am satisfied that the State has met its burden, and I am going to find the defendant guilty of both attempted armed robbery, as a principal, and second degree murder." (at pp 52-54)

Defendant Lara took an appeal on the waiver of the trial by jury. The District Court of Appeal, Third District, in *Lara v. State*, 475

So.2d 1340 (1985), held that waiver of a jury trial is a "perfectly legitimate trial tactic calculated to enhance the defendant's chances of acquittal." That Opinion is significant here in defining a standard of representation of attorney Houlihan, who protected defendant Lara's rights by "calculated efforts to enhance Lara's chances of acquittal."

In defendant's Motion for Post-Conviction Relief, Lara's present attorneys submit a laundry list of alleged errors committed by Lara's trial counsel. That list reduces itself, according to those attorneys, to Houlihan's permitting "additional" evidence to come before Judge Feder; evidence that was not actually contained in the Stipulation, but which when added to the circumstantial evidence against Lara was sufficient to convict him. Those "additional" facts are the following:

1. The getaway car was illegally parked;

2. The getaway car was parked 25 yards from the store (not a half block);

3. The Wells Fargo employees could not see or hear the robbery, but knew enough to block Mr. Lara because of his conduct;

4. Mr. Lara saw the co-defendants enter the car with their guns, rather than the agreement that the Wells Fargo employees could see the guns when the co-defendants entered the car;

5. Mr. Lara did not hear the first bullet fired by Mr. Perez;

6. Mr. Lara drove the robbers to the store;

7. Mr. Lara first drove away at a high rate of speed;

8. Mr. Lara had his gun under his seat, rather than somewhere under the front seat; and

9. That Mr. Houlihan stipulated that his client sat in the driver's seat 'looking around suspiciously' without even knowing he had made that stipulation.

This Court, however, does not view these items as "additional" evidence, but rather as proper inferences than can be drawn from the Stipulated facts submitted to Judge Feder.

### Attorney Houlihan's Testimony

With respect to Attorney Houlihan, his testimony was credible. Houlihan is an Assistant Public Defender of impeccable reputation, of the highest integrity, a skilled advocate and defense attorney with a specialty in murder cases; he is indefatigable in his preparation of a case both as to the facts and the law, is a person who is concerned for his client's well-being and who communicates frequently with the

clients he represents. Houlihan was assisted by Attorney Patrick Nally, also of the Public Defender's Office, who, at that time, was assigned to the Lara case as the Number 2 lawyer and who enjoyed a good reputation but who lacked Houlihan's depth of experience.

Attorney Houlihan testified that he was "misled" into believing that Judge Feder would almost pro forma acquit the defendant and as such, he, Houlihan, was merely going through the motions of a stipulated set of facts and of a "trial" before Judge Feder. Houlihan based his belief on Judge Feder's "reaction" to the State's opposition to defendant's Motion to Suppress. In denying that Motion, Judge Feder had inquired of the State: "Is this all you have?" Houlihan candidly pointed out, however, that Judge Feder did not "wink an eye," did not "grunt," and did not offer any other sign of an impending acquittal. Nevertheless, he, Houlihan, "felt" with 95% certainty that Judge Feder would grant an acquittal, even though an acquittal could not be guaranteed. Houlihan also thought that Judge Feder's imminent departure from the Criminal Division increased the chances of acquittal. Houlihan, by way of hindsight, admitted that he had not accurately, "evaluated" Judge Feder's intentions, since on reflection by Houlihan, Judge Feder did not give any overt indication that an acquittal was likely.

Houlihan further said that Nally, his co-counsel, had quizzically said "Maybe you're misreading Judge Feder," and that query made Houlihan wonder if he were right in his appraisal of Judge Feder. Houlihan spoke to more than twenty (20) lawyers, including supervising attorneys, in the Public Defender's Office regarding the case before making his decision.

Houlihan, in evaluating the strategic choices available to him, relied on his considerable trial experience. He previously had tried about fifty (50) major jury cases and hundreds of non-jury trials. Houlihan thought that the prosecution, by agreeing to a waiver of a jury trial, had found the solution to a difficult situation. By agreeing, the State would save face and avoid the loss of a jury trial in a case which Houlihan thought was weak. Houlihan "believed in his heart" and "95% in his mind," that there would be an acquittal by Judge Feder.

The case was very well prepared, according to Houlihan, and Lara trusted Houlihan and would rely on his advice. Houlihan said he did not treat the "trial" before Judge Feder as an adversary one. Houlihan believed that Lara would have had potential problems before a jury and that Lara had a better chance before a judge, especially because an innocent 17-year old girl was killed in the incident. Substantially all of the more than twenty (20) attorneys with whom Houlihan spoke came

to the same conclusion as Houlihan, namely to permit Judge Feder to try the case by Stipulation. Houlihan said he had appeared before seven or eight other judges and knew their thinking. He felt that a judge would be better than a jury, and that there was only a 50-50 chance with a jury. Houlihan inquired around the Courthouse and confirmed his opinion that Judge Feder was "defense oriented." Houlihan said that even though he took out two paragraphs of the Stipulation submitted to him by the State Attorney, he believed that he could have tried to put in facts more favorable to defendant. Because he was so certain of an acquittal, he went through the formalities of the Stipulation without being fully alert to any dangers that the Stipulation might pose. Houlihan "felt" that the hearing before Judge Feder, based on his (Houlihan's) appraisal of the entire situation, would be a charade rather than an actual trial.

The foregoing considerations moved Houlihan to recommend to Lara the waiving of the jury. Houlihan spoke to defendant Lara five to six times for long periods of time and explained the Stipulation to him. It is noteworthy that Mr. Lara maintained for most of the pre-trial proceedings that he was never in the car with the other two co-defendants, a contention which was untrue. Houlihan said he made a strategic decision on the manner of handling the case, but that he always took steps in the best interest of Mr. Lara.

### Defendant Lara's Testimony

Defendant Lara testified that he relied on Houlihan for advice. Lara's testimony, insofar as delivery was concerned was, for the most part, credible; but in substance the testimony was not credible. It was inconsistent with the testimony of Houlihan and with that of Lara's co-defendant Rodriguez, who also testified at the Rule 3 hearing, on points that this Court deemed to be crucial. It should be noted that when an interpreter is used, as was the case with Messrs. Lara and Rodriguez, credibility and demeanor of a witness are more difficult to ascertain.

Defendant Lara explained his presence in the car with the co-defendants. Lara said that he coincidentally had met co-defendants Rodriguez and Batista while they were pumping gas at a gasoline station in the neighborhood . Lara claimed that he was taking his wife to a doctor's appointment for an imminent operation and that his wife's girlfriend, Tamara, was with them. Lara said that Rodriguez asked him to drive Rodriguez' car because there were many policemen in the area and Rodriguez did not have a valid driver's license. Accordingly, after an argument with his wife, Lara left his wife with

Tamara who was to drive Lara's wife to the doctor's appointment. Lara then drove Rodriguez' car to a destination Rodriguez did not disclose in advance. According to Lara, Rodriguez simply told Lara which streets to use without naming a destination; Rodriguez claimed he had to meet a man in a store in order to collect a debt. After Lara parked the car and his two co-defendants entered the cafeteria, Lara did not hear any shots until the door to the car was opened, after the co-defendants had fled the cafeteria. Lara said he never saw a gun until the doors to the car were opened.

Lara said he parked the car on the side of the cafeteria building prior to the incident since he would not park in front of the building because there was a bus stop there. Lara said he then got out of the car for a moment because it was hot, and sat on the hood of the car. Later, Lara got back into the car to listen to the radio and to turn on the air conditioner. On cross-examination, Lara testified that the owner of the cafeteria and Lara knew each other.

Lara admitted he lied to a plainclothes police officer when Lara was not yet aware that the young girl had been shot. Lara claimed he was frightened when the officer said at the scene of the automobile accident, that Lara had killed a girl. Lara said the police told him that he was involved in a robbery and killing and would get the electric chair, and he falsely responded, "I was never in the car," to avoid the blame. Lara admits he told Houlihan the same lies, but told the truth to Houlihan when Lara was rearrested after fleeing the jurisdiction and jumping bond.

Lara said that Houlihan and Lara were ready for trial. Lara said that Houlihan did not advise him for over a month and a half as to the results of the Sworn Motion to Dismiss, and that he only learned of the Court's denial of that motion about three days prior to the proceedings before Judge Feder. Lara said that Houlihan advised him, that he was "sure the judge will throw the case out," and "don't worry, you will go home." Lara said that Houlihan assured him that there was a 95% chance he would be found not guilty, and therefore there was no doubt in Lara's mind that the judge would acquit him of all charges.

Lara said Houlihan spoke to him about thirty to forty times prior to Lara's fleeing the jurisdiction. Significantly, Lara's testimony was that Houlihan advised Lara to respond "yes" to everything the judge asked of him at the trial on the stipulated facts. After Judge Feder found Lara guilty, Lara asked Houlihan when he would testify and Houlihan said, "you don't have time now."

### Co-defendant Rodriguez' Testimony

Co-defendant Rodriguez testified that he met Lara at a gasoline station and he advised Lara that he had to go to a store to collect a debt. Rodriguez did not tell Lara that the debt was $7,200 owed in payment for 24 pounds of marijuana previously delivered to that storekeeper. Rodriguez said that he carried a gun with him whenever he was in that area, because it was a "bad area, but not too bad." Rodriguez said he carried his gun in his front waistband and that when he got to the cafeteria, Mr. Perez, the proprietor, pulled a gun out first and that Rodriguez tried, but failed to get his own gun out of his waistband. Rodriguez said that he never pulled a gun out of his waistband, even upon his return to the car. On cross-examination, the State Attorney used the polygraph records introduced by Lara to show that Rodriguez had admitted to the polygraph examiner that Rodriguez had, in fact, pulled out the gun in the cafeteria and held the gun at eye level.

Rodriguez also testified that at the gasoline station there was no one else with Lara and his wife, i.e., there was no person such as Tamara at the gasoline station, as testified to by Lara. Rodriguez said that Houlihan never questioned or interviewed him for purposes of Lara's trial. It was clear from Rodriguez' testimony that there were three guns in the automobile, one with Rodriguez, one with Batista, and one under the front seat from which Lara drove that car. Rodriguez also gave the police at least two different stories about the incident with Perez, which included a claim that he did not know any of the people in the car and that he, in fact, pulled his gun out while with Perez.

### Applicable Law

According to counsel for the State and for Lara, there is no case directly on point on the contentions urged in behalf of defendant. However, there are many cases which set forth various standards of effective or ineffective assistance of counsel which the Court has read with interest. The Court concludes that of all the cases cited, *Strickland v. Washington*, 104 S.Ct. 2052 (1984), is the most helpful. There, after a guilty plea, defense counsel considered various approaches to the sentencing, but did not seek out character witnesses or request a psychiatric examination of his client. That omission was based on counsel's view of the judge and the judge's past favorable reaction to those defendants who were willing to come forward and admit their responsibility. Although defense counsel had refused to pursue other avenues which might be considered "usual," he had what he considered to be good reasons for his refusal to do so. The Supreme Court, in

**67**

an opinion by Justice O'Connor, took the opportunity to set forth the proper standards for judging a criminal defendant's contention that the Constitution requires overturning a sentence because of ineffective assistance of counsel. The Supreme Court noted that defense counsel was an experienced criminal lawyer; that defense counsel experienced a sense of hopelessness about the case; that the defendant acted against counsel's advice; and that defense counsel based his strategy primarily upon his "reading" of the judge as well as on the judge's reputation as a sentencing judge who thought it important for a convicted defendant to own up to his crime.

Extensive reference to the standards in the *Strickland* case are appropriate here:

> "If there is more than one plausible line of defense, the court held, counsel should ideally investigate each line substantially before making a strategic choice about which lines to rely on at trial. If counsel conducts such substantial investigations, the strategic choices made as a result 'will seldom if ever' be found wanting. Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." (at p. 2061)

> . . . . . . . . . . . .

> "Thus, 'when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial.'" (at p. 2061)

> . . . . . . . . . .

> "In assessing attorney performance, all the Federal Courts of Appeals and all but a few state courts have now adopted the 'reasonably effective assistance' standard in one formulation or another." (at p. 2062)

> . . . . . . . . . .

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

conduct, and to evaluate the conduct from counsel's perspective at the time." (at p. 2065)

. . . . . . . . . .

"The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. . . . Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (at p. 2066)

. . . . . . . . . .

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." (at p. 2066)

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (at p. 2068)

. . . . . . . . . .

"The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decision maker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudices determination." (at pp. 2068-2069)

. . . . . . . . . .

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire eviden-

**69**

tiary picture, and some will have had an isolated, trivial effect." (at p. 2069)

## Discussion

The evidence offered by Lara and his co-defendant Rodriguez was inconsistent or unbelievable: the "coincidental" gas station meeting; the agreement by Lara to drive the other car and let his wife go to the doctor without him; the questionable presence of Tamara at the gasoline station; the alleged lack of a driver's license by Rodriguez who had driven the car to the gasoline station, but who would drive no further due to the police in the area; the parking of the car on the side of the cafeteria rather than in front; Lara and the cafeteria owner knowing each other; Lara sitting on the hood of the car in hot weather; the conflicts as to whether Lara or anyone else had a gun and what was done with those guns, all point to Lara's probable conviction if tried by a jury.

Was Houlihan's advice to Lara, and Lara's decision to accept that advice a strategic choice that, in this case, simply did not bring about the desired results? Or did Houlihan ineffectively assist Lara in both his decision making and in the conduct of the trial? An analysis of the facts shows that Houlihan's decisions were reasonable under the totality of the circumstances and that, therefore Lara received effective assistance at trial. See *Meeks v. State*, 382 So.2d 673 (Fla. 1980).

It appears that Houlihan's assessment of the entire situation was a reasonable one under the circumstances. Lara stood a better chance for acquittal before a judge than before a jury. Houlihan made a professional decision to avoid exposing witnesses to a test of their credibility, and to try the case upon stipulated facts. Houlihan did not merely rubber stamp the Stipulation but, reviewed it, took out two paragraphs he did not like, and otherwise made sure that a jury trial would not result.

To accept Lara's contentions would mean, as a matter of policy, that every non-jury conviction could be overturned merely because an attorney who "felt" the court would acquit his defendant acted to bring the case before the judge for trial. That is not the law. Here, the attorney for Lara thoroughly prepared the case, made strategic decisions along the way, consulted with some two dozen attorneys in his office including supervisory attorneys, questioned his own decisions, and then made a calculated decision on the best method of handling the case. That decision was reasonable under the circumstances of this case.

70

Accordingly, this court cannot, in good conscience, say that Lara received ineffective assistance of counsel such as to change the outcome of the case for Mr. Lara.

## Findings of Fact and Conclusions of Law

This Court reviewed the file in this cause, has observed the testimony and demeanor of the witnesses during the Rule 3 hearing, has read countless cases submitted by the attorneys for the parties, and has done independent research. The Court has listened over a period of many hours to the oral argument of respective counsel; and the Court has agonized over the contentions urged in behalf of Mr. Lara, especially those of Lara's trial counsel, Mr. Houlihan, in whom the Court places a great deal of confidence. Based on the foregoing, the Court makes the following findings and conclusions of Law:

1. The testimony of Mr. Lara is not credible on the specific matters going to the substantive charges against him. Lara intelligently understood and agreed to the proceedings before Judge Feder.

2. Houlihan's alleged "mind set" was nothing more than a strategic choice; and if Mr. Lara had been acquitted, Houlihan would have been dubbed a "strategic genius" rather than an "ineffective counsel."

3. Mr. Lara's attorney, Houlihan, is a skilled trial attorney who made strategic choices in the handling of this case, just as other skilled attorneys would do, and he rendered effective assistance to Mr. Lara under the circumstances of this case.

4. The circumstantial evidence against Mr. Lara is overwhelming, and this Court feels secure in knowing that Mr. Lara was accorded both substantive and procedural due process by effective counsel.

5. Mr. Lara has not shown that his trial counsel's assistance reflected any substantial and serious deficiency measurably below that of competent counsel that was likely to have affected the outcome of the proceedings.

Based on the foregoing, IT IS HEREBY ADJUDGED that:

1. Mr. Lara's Motion for Post Conviction Relief is denied in all respects; and

2. Ramon Lara has the right to appeal this Order denying his Motion for Post Conviction Relief within thirty (30) days of its rendition and for rehearing within fifteen (15) days of service hereof.

DONE AND ORDERED in Chambers at Miami, Dade County, Florida, this 1st day of May, 1987.